IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE SUBPOENAS SERVED ON LLOYDS BANKING GROUP PLC; LLOYDS AMERICA SECURITIES CORPORATION; LLOYDS BANK CORPORATE MARKETS PLC; THE CANADIAN IMPERIAL BANK OF COMMERCE; CIBC BANK U.S.A.; BANK OF AMERICA CORPORATION; BANK OF AMERICA, N.A.; WELLS FARGO & COMPANY; WELLS FARGO BANK, N.A.; THE GOLDMAN SACHS GROUP, INC.; GOLDMAN SACHS & CO. LLC; GOLDMAN SACHS INTERNATIONAL; MORGAN STANLEY; MORGAN STANLEY & CO. LLC; MORGAN STANLEY & CO. INTERNATIONAL PLC; MIZUHO BANK, LTD.; MIZUHO AMERICAS LLC; MIZUHO SECURITIES USA LLC; CRÉDIT AGRICOLE CIB; CREDIT AGRICOLE SECURITIES (USA) INC.; CREDIT AGRICOLE AMERICA SERVICES, INC.; SOCIÉTÉ GÉNÉRALE S.A.; SG AMERICAS SECURITIES, LLC; BANCO SANTANDER, S.A.; AND SANTANDER HOLDINGS USA, INC.:<br><br>UKRAINE,<br><br>       Petitioner,<br><br>  -against-<br><br>PAO TATNEFT,<br><br>       Respondent. | Misc. Case No. 1:21-mc-00376-JGK-SN<br><br>(Arising from Case No. 1:17-cv-00582-CKK in the United States District Court for the District of Columbia, pending on appeal in Case No. 20-7091 in the United States Court of Appeals for the District of Columbia Circuit) |

**UKRAINE'S REPLY IN SUPPORT OF
MOTION TO QUASH THIRD-PARTY SUBPOENAS**

# <u>TABLE OF CONTENTS</u>

**Page**

I.      PROCEDURAL BACKGROUND ................................................................................. 1

II.     ARGUMENT ........................................................................................................... 3

      A.      Ukraine's Sovereign Interests and the Demands of Comity Convey Standing and
              Entitle Ukraine to Its Requested Relief ................................................................. 3

      B.      Tatneft Has Not Tailored Its Requests to Aid Execution of the Judgment Nor Met
              Its Burden of Demonstrating Relevance and Proportionality ................................. 8

III.    CONCLUSION ........................................................................................................ 10

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Aurelius Cap. Master, Ltd. v. Rep. of Arg.*,
    589 F. App'x 16 (2d Cir. 2014) ...................................................................................8

*Aurelius Cap. Partners v. Rep. of Arg.*,
    2013 WL 857730 (S.D.N.Y. Mar. 7, 2013) ...............................................................4, 5, 8, 9

*Belize Bank Ltd. v. Belize*,
    191 F. Supp. 3d 26 (D.D.C. 2016) .............................................................................1

*Citizens Union of City of New York v. Att'y Gen. of New York*,
    269 F. Supp. 3d 124 (S.D.N.Y. 2017).......................................................................8, 10

*Costomar Shipping Co. v. Kim-Sail, Ltd.*,
    1995 WL 736907 (S.D.N.Y. Dec. 12, 1995) ............................................................8

*EM Ltd. v. Rep. of Arg.*,
    865 F. Supp. 2d 415 (S.D.N.Y. 2012)......................................................................3

*Esso Expl. & Prod. Nigeria Ltd. v. Nigerian Nat'l Petroleum Corp.*,
    2017 WL 3491975 (S.D.N.Y. Aug. 15, 2017)..........................................................6

*GMA Accessories, Inc. v. Elec. Wonderland, Inc.*,
    2012 WL 1933558 (S.D.N.Y. May 22, 2012) ..........................................................8

*Hypertherm v. Am. Torch Tip*,
    2008 WL 5412894 (D.N.H. Dec. 23, 2008)..............................................................2

*Jacobson v. Moller & Moller, Inc.*,
    2007 WL 1989260 (E.D.N.Y. July 5, 2007).............................................................8

*NML Cap., Ltd. v. Rep. of Arg.*,
    2013 WL 491522 (S.D.N.Y. Feb. 8, 2013)...............................................................6, 9, 10

*NML Capital v. Rep. of Arg.*,
    695 F.3d 201 (2d Cir. 2012).....................................................................................9

*Rep. of Arg. v. NML Capital*,
    573 U.S. 134 (2014).................................................................................................9, 10

*Selvitella v. S. San Francisco*,
    2009 WL 5206425 (N.D. Cal. Dec. 24, 2009).........................................................2

*Sinochem v. Malaysia Int'l Shipping*,
    549 U.S. 422 (2007)..................................................................................................2

*Societe Nationale Industrielle Aerospatiale v. U.S. Dist. Ct. for S. Dist. Of Iowa*,
    482 U.S. 522 (1987)..............................................................................................4, 5

*Solow v. Conseco, Inc.*,
    2008 WL 190340 (S.D.N.Y. Jan. 18, 2008) ...........................................................3

*State Farm Life Ins. v. Bryant*,
    2019 WL 7938266 (N.D. Tex. May 16, 2019) ........................................................2

*Tiffany (NJ) LLC v. Qi Andrew*,
    276 F.R.D. 143 (S.D.N.Y. 2011) ............................................................................7

*Wilmington Tr., N.A. v. Est. of Gonzalez*,
    2018 WL 10159760 (S.D. Fla. Sept. 19, 2018) ....................................................10

**Foreign Law**

*OAO Tatneft v. Ukr.*,
    PCA Case No. 2008-8................................................................................................7

*Pao Tatneft v. Ukr.*
    [2020] EWHC 3161 (Comm), Judgment of Nov. 23, 2020....................................1

UK Civil Procedure Rule 52.7 ............................................................................................1

**Statutes**

28 U.S.C. § 1611...................................................................................................................4

**Other Authorities**

Fed. R. Civ. P. 45..................................................................................................................3

Fed. R. Civ. P. 69...........................................................................................................8, 9, 10

Ukraine has a strong interest in safeguarding sensitive information about its financial affairs and those of third parties that are important to the nation's welfare. This interest is particularly strong where, as here, information is requested by an entity with close ties to a hostile state. Tatneft does not deny the importance of Ukraine's interest and fails to show that it is overcome by any competing interest in enforcement of the D.C. District Court's judgment, which Tatneft should pursue by submitting a properly documented claim for payment from the Ukrainian State Treasury as contemplated by the treaty under which the arbitral award was rendered. Because Ukraine's interest in protecting sensitive information outweighs Tatneft's interest in irrelevant information disproportional to its needs, the subpoenas should be quashed or at least modified.

## I.     PROCEDURAL BACKGROUND

This motion to quash arises from subpoenas allegedly issued in aid of execution of a D.C. District Court judgment confirming an award. Ukraine's appeal of the judgment and its motion to stay execution, including related discovery, are pending in D.C. where the judgment originated.

Ukraine's appeal raises legitimate arguments with a real prospect of success. In particular, the strength of the argument that illegality bars enforcement under the New York Convention is shown by the UK High Court of Justice's determination that Tatneft's investment in Ukrtatnafta shares through Amruz and Seagroup was contrary to the law of Ukraine. *See Pao Tatneft v. Ukr.* [2020] EWHC 3161 (Comm), Judgment of Nov. 23, 2020.[1] On arbitrator bias, Ukraine's appeal is its first opportunity to show that Tatneft was mistaken to argue in its reply that bias can be considered only under Article V(2)(b) of the Convention. *See, e.g.*, *Belize Bank Ltd. v. Belize*, 191 F. Supp. 3d 26, 36–38 (D.D.C. 2016) (evaluating bias under Article V(1)(d)). And Ukraine's

---

[1] While the court upheld the illegality argument, it relied on equitable principles of estoppel and waiver not to set aside an order enforcing the award. In granting Ukraine permission to appeal, the UK Court of Appeal recently confirmed that Ukraine has a "real prospect of success" in its appeal against the court's reliance on estoppel and failure to draw consequences from illegality, given the parties' agreement to brief objections in two stages. *See* CPR 52.7; Ex. A.

1

*forum non conveniens* argument addresses a conflict between the court's opinion and *Sinochem v. Malaysia Int'l Shipping*, 549 U.S. 422, 430 (2007).  The final appellate brief is due July 8, 2021.

Ukraine's motion to stay execution, including discovery in aid of execution, was filed March 29, 2021 (after its motion to quash) and may be decided any day.  *Pao Tatneft v. Ukr.*, 1:17-cv-00582, Mot. Stay, Dkt. 67 (D.D.C. Mar. 29, 2021).  Ukraine argued, among other things, that sweeping discovery of worldwide assets belonging to Ukraine and others important to the nation's welfare threatened irreparable harm, especially given the high risk that sensitive information will fall into the hands of Russia.  If the motion is granted, it will stay the subpoenas issued on the D.C. District Court's authority, mooting the motion to quash.  *See, e.g.*, *State Farm Life Ins. v. Bryant*, 2019 WL 7938266, at *1 (N.D. Tex. May 16, 2019) (stay of discovery moots motion to quash); *Selvitella v. S. San Francisco*, 2009 WL 5206425, at *8 (N.D. Cal. Dec. 24, 2009) (same); *Hypertherm v. Am. Torch Tip*, 2008 WL 5412894, at *1 (D.N.H. Dec. 23, 2008) (same).  Deferring decision on the motion to quash would promote judicial economy, consistency, and efficiency.[2]

While Ukraine's appeal was pending, Tatneft served subpoenas on 25 financial institutions, strategically timed to disrupt Ukraine's and its counsel's preparation for a hearing in a parallel arbitration, in which Tatneft's counsel represents Tatarstan against Ukraine.[3]  Br. 1–5.  Given the subpoenas' threat to sensitive information, Ukraine moved to quash.

---

[2] Tatneft falsely alleges in a footnote, "Ukraine agreed not to invoke its stay motion . . . as grounds to resist the banks' responding to the subpoenas."  Opp. 5 n.5.  No such agreement was ever discussed or entered.  Tatneft requested that Ukraine agree not to rely on the motion "as reason not to engage with us then [at the end of April] on the subpoenas."  Ex. B.  Ukraine agreed not to rely on the motion "as reason not to engage with you on the subpoenas" at the end of April, expressly clarifying, "We reserve all rights with respect to the arguments that can be raised in court, should the negotiations not lead to a common understanding about the subpoenas by the end of April 2021."  Dkt. 11-8.

[3] The timing of Tatneft's discovery was hardly a coincidence.  Tatneft waited until February 23 to serve discovery on Ukraine, so that Ukraine had to respond by March 25, the date of the pre-hearing conference in the parallel arbitration.  Ex. C; Ex. D, Ex. E.  It waited until days before that conference to serve notice of twenty-five third-party subpoenas, demanding responses by April 7 and April 14, just before a week-long hearing in the parallel arbitration scheduled to begin April 19.  Dkt. 2-1; Dkt. 2-2; Ex. E.  Tatneft later suggested "a short ten-day extension" of time to respond to Ukraine's motion to quash without mentioning that this would push Ukraine's reply to the first day of arbitration.  Ex. F.  After Ukraine raised an issue with Tatneft and Tatarstan's disruptive tactics, Tatneft's lead counsel conspicuously came off the signature block for the first time in the U.S. litigation for purposes of its opposition.

In correspondence, Tatneft asserted that Ukraine should withdraw its motion as premature for failure to satisfy meet-and-confer obligations. Ex. F. Ukraine noted that Tatneft cited no basis for such an obligation and explained that Local Rule 37.2 does not apply to a Rule 45 motion to quash and contemplates a conference with the Court that is impossible before a judge is assigned. Ex. G. Ukraine reminded Tatneft that its letters of objection had inquired if Tatneft would agree to narrow the subpoenas. *Id.* Tatneft abandoned its request to withdraw the motion and agreed to negotiate pursuant to an extended briefing schedule. Ex. B. Negotiations ultimately failed.

Tatneft's efforts purportedly in aid of execution are wasteful and disproportionate because Ukraine has a process for judgment creditors like Tatneft to enforce foreign judgments and arbitral awards by submitting claims for payment from the Ukrainian State Treasury. *See Pao Tatneft v. Ukr.*, 1:17-cv-00582, Tyshchenko Declaration, Dkt. 67-10 (D.D.C. Mar. 29, 2021). Ukraine is no Argentina. Unlike Argentina—which after a financial crisis and state default developed a policy of "intransigence in failing to honor its lawful judgment debts,"[4]—Ukraine has a policy, procedure, dedicated budgetary program and proven track record for paying upon submission of properly documented claims, Tyschchenko Decl. Yet Tatneft has wasted significant time and resources by seeking sweeping discovery of sensitive information instead of submitting a claim for payment.

## II.   ARGUMENT

### A.  Ukraine's Sovereign Interests and the Demands of Comity Convey Standing and Entitle Ukraine to Its Requested Relief

"[I]t is well-established that a party with a real interest in the documents has standing to raise objections to their production." *Solow v. Conseco, Inc.*, 2008 WL 190340, at *3 (S.D.N.Y. Jan. 18, 2008); *see* Opp. 6 (agreeing that standing requires a "real and defined interest" in requested

---

[4] *EM Ltd. v. Rep. of Arg.*, 865 F. Supp. 2d 415, 417 (S.D.N.Y. 2012); *see also* Ex. H, at 5, 12 (noting that "years of costly litigation have not compelled Argentina to pay holdouts," and that Argentine law prohibited such payments).

information).  Where subpoenas seek information about a nation's financial affairs, that nation "has standing to seek to quash the subpoenas." *Aurelius Cap. Partners v. Rep. of Arg.*, 2013 WL 857730, at \*2 (S.D.N.Y. Mar. 7, 2013).  Moreover, "in suits involving foreign states, either as parties or as sovereigns with a coordinate interest in the litigation," courts must account for "the demands of comity" and "any sovereign interest expressed by a foreign state." *Societe Nationale Industrielle Aerospatiale v. U.S. Dist. Ct. for S. Dist. Of Iowa*, 482 U.S. 522, 546 (1987).

Ukraine has articulated real and defined interests that are particularly strong where, as here, discovery is sought by a party with close ties to a hostile state.  The vitality of these interests is not rebutted by Tatneft, which relies on cases that do not address similar interests.

*First*, Ukraine has an interest in the confidentiality of information about its assets and the assets of related but distinct entities that enjoy sovereign immunity.  Br. 10–11.  For example, U.S. law recognizes the importance of activities like central banking, sovereign bond activities, diplomatic and consular spending, and the disposition of military funds and equipment by granting sovereign immunity to property used for these activities.  23 U.S.T. 3227; 21 U.S.T. 77; 28 U.S.C. § 1611.  Ukraine has a strong interest in sensitive information about such important activities.

Tatneft argues that Ukraine has inadequately asserted this interest by making only "conclusory assertions" about the sensitivity of sovereign bond activities.  Opp. 7–8.  Not only does this argument not address Ukraine's interest in other activities, but it is unpersuasive given common knowledge that bonds are a key instrument of monetary policy and macroeconomic stability.  The U.S. treats a leak about its own plans to issue or trade bonds as a national concern. Ex. I (describing internal, DOJ, and congressional investigations into leak about Federal Reserve's intended bond purchases).  Similarly, Ukraine has a real interest in information about its sovereign bond activities and in keeping it from Russia, with its pattern of economic aggression.

4

*Second*, Ukraine has an interest in compliance with its laws and treaties.  Br. 13.  The treaty under which the arbitral award issued provides for compliance with awards rendered against Ukraine in conformity with *its* Ukrainian legislation.  Dkt. 2-3, art. 9(3).  This reflects Ukraine's strong interest in compliance with laws and regulations that act as "a necessary safeguard against abusive spending, embezzlement, and diversion of public funds."  *See* Tyshchenko Decl. ¶ 10.  Tatneft seeks to do an end-run around the legitimate process for paying the award and judgment.

Tatneft claims this argument has been rejected by the D.C. District Court.  Opp. 8.  Not so.  That court addressed *forum non conveniens* (the subject of a circuit split between the D.C. and Second Circuits) without discussing Ukraine's interest in compliance with its treaties and laws.  *Pao Tatneft v. Ukr.*, 1:17-cv-00582, Opinion, Dkt. 34, 21–24 (D.D.C. Mar. 19, 2018).  This Court's consideration of Ukraine's interest in compliance with its legal regime is not foreclosed.

*Third*, Ukraine has an interest in confidentiality of sensitive information about the financial affairs of Ukraine and third parties of strategic importance to the nation's welfare.  Br. 11–12.  To the extent the subpoenas' extraterritorial scope demands disclosure of this information contrary to confidentiality interests recognized and protected by foreign bank secrecy laws, they should be quashed.  Tatneft cites *Aurelius* for the proposition that a "violation of foreign laws is insufficient to confer standing."  Opp. 7.  But in *Aurelius* the party seeking to quash failed to indicate "how, if at all, it would be harmed by the banks' possible violation of foreign law."  *Aurelius*, 2013 WL 857730 at *4.  Here, violations would harm Ukraine by jeopardizing sensitive information about Ukraine's sovereign activities and activities of third parties with pivotal roles in the nation's economy, including energy, infrastructure, banking, transportation, and defense.[5]

---

[5] Tatneft apparently concedes this implicates comity but argues *Aerospatiale*'s instruction to account for the demands of comity does not apply to concerns about information subpoenaed from a non-party in contravention of foreign law.  Opp. 7 n.6.  Tatneft cites no authority, and its view contradicts the Supreme Court's recognition that even if a foreign state is not a party it may have an "interest in the litigation" that must be considered.  *Aerospatiale*, 482 U.S. at 546.

Tatneft misses the point when it claims Ukraine is "not authorized to represent" and lacks standing to file a motion "on behalf of" third parties whose information is sought by the subpoenas, unless it establishes that they are alter egos of Ukraine. Opp. 1, 8–9. Ukraine is not representing and has not filed its motion on behalf of third parties. Instead, Ukraine is asserting its own interest in the confidentiality of sensitive information about third parties that are important to the nation's welfare. Unlike the contradictory positions taken by the Central Bank of Nigeria in *Esso*, there is no contradiction between Ukraine's assertion that these entities are important to the nation's welfare and its assertion that they are legally distinct from Ukraine. *See Esso Expl. & Prod. Nigeria Ltd. v. Nigerian Nat'l Petroleum Corp.*, 2017 WL 3491975, at *2 (S.D.N.Y. Aug. 15, 2017). Whether third parties qualify as agencies, instrumentalities, or alter egos is Tatneft's burden in demonstrating relevance, as discussed below. It has no bearing on their importance to the nation's welfare—a real and fundamental interest of any nation and a strong basis for standing.

The five-factor test proposed by Tatneft confirms the subpoenas should be quashed. This test can be invoked where a subpoena recipient complains that compliance with the subpoenas would subject it to liability under foreign law. *NML Cap., Ltd. v. Rep. of Arg.*, 2013 WL 491522, at *9 (S.D.N.Y. Feb. 8, 2013). While it is not controlling where Ukraine asserts its own interest in the requested information rather than the subpoena recipients' interest in avoiding liability, the test supports Ukraine's position. As to the information's importance, Ukraine has shown that the subpoenas seek information not calculated to aid in execution of the judgment. Br. 6–10, 13. As to the subpoenas' specificity, Ukraine has shown their demands are ambiguous and overbroad. Br. 6–10. As to the information's location, the objection for violation of foreign laws does not concern information in the United States but rather the rest of the world, except in Ukraine, where most of Ukraine's assets are located—making it impossible to say with greater specificity than already

6

provided which countries' laws may apply.  As to the availability of alternative means of securing information, Tatneft has not even suggested that it seeks information available only by subpoena and not through the Hague Evidence Convention or other means.  As to the balance of national interests, Ukraine has explained its national interest in protecting sensitive information.  Br. 11–12.  Its interests are reinforced by those that prompted other nations to enact their laws.  On the other hand, "the Banks' status as non-parties does attenuate the United States interest in enforcing discovery obligations."  *Tiffany (NJ) LLC v. Qi Andrew*, 276 F.R.D. 143, 157 (S.D.N.Y. 2011). Thus, one factor is at worst neutral and four confirm the need to quash.

Ukraine's real and defined interests are particularly strong where discovery risks leakage of sensitive information to a hostile state.  Tatneft was Tatarstan's national oil company, created pursuant to a decree by Joseph Stalin.  *Pao Tatneft v. Ukr.*, 1:17-cv-00582, Exhibit, Dkt. 24-1 (D.D.C. July 25, 2017).  Even after nominal privatization, it retains close ties to Tatarstan, which is a part of the Russian Federation.  In addition to retaining indirect 36% ownership, Tatarstan retains a "golden share" that, irrespective of other shareholding, gives it veto power over important decisions.  *OAO Tatneft v. Ukr.*, PCA Case No. 2008-8, Partial Award on Jurisdiction, ¶ 43. Tatarstan has even used the company's assets to raise capital and pay its debts.  *Id.* ¶¶ 129, 141. Moreover, the Advisor to Tatneft's General Director on International Legal Matters is a member of the Advisory Council of the Russian Federation's Ministry of Justice.  Ex. J; Ex. K.  He appeared on the record in the arbitration underlying these proceedings and in the parallel Tatarstan arbitration.  Ex. L; Ex. M.  Given the close ties between Tatneft and a hostile state, Ukraine cannot accept the suggestion that "a standard protective order" would address its interests.  *See* Opp. 14.

The stakes are too high to risk Russia obtaining sensitive information from Tatneft, which could realistically happen with or without the consent of management and could easily take place

with even one individual's cooperation.  Ukraine's national security depends on the confidentiality of sensitive information about Ukraine and third parties important to the nation's welfare.  It is hard to imagine any interest more real or relevant to the demands of comity.  *See Aurelius Cap. Master, Ltd. v. Rep. of Arg.*, 589 F. App'x 16, 18 (2d Cir. 2014) (noting comity's "particular weight when it comes to a foreign sovereign's diplomatic and military affairs").  These interests outweigh Tatneft's, particularly given the availability of a proven and reliable process allowing judgment creditors like Tatneft to enforce foreign judgments by submitting claims for payment.

### B. Tatneft Has Not Tailored Its Requests to Aid Execution of the Judgment Nor Met Its Burden of Demonstrating Relevance and Proportionality

Because Rule 69 discovery must be in aid of execution, it must be "tailored to seek only information regarding assets that could realistically be seized by plaintiffs."  *Aurelius*, 2013 WL 857730 at *3; *see also* Opp. 9 (arguing "Tatneft's subpoenas are appropriately tailored").  Thus, "disclosure concerning the assets of a non-party is generally not contemplated."  *GMA Accessories, Inc. v. Elec. Wonderland, Inc.*, 2012 WL 1933558, at *5 (S.D.N.Y. May 22, 2012); *see also Jacobson v. Moller & Moller, Inc.*, 2007 WL 1989260, at *2 (E.D.N.Y. July 5, 2007) ("[Discovery] must be limited to information that relates to the judgment debtors, their assets or suspected transfers of their assets"); *Costomar Shipping Co. v. Kim-Sail, Ltd.*, 1995 WL 736907, at *3 (S.D.N.Y. Dec. 12, 1995) ("Generally, non-parties may only be examined about the assets of a judgment debtor . . .").  Tatneft bears the "initial burden of proving that the information and documents sought are relevant and proportional to the needs of the case."  *Citizens Union of City of New York v. Att'y Gen. of New York*, 269 F. Supp. 3d 124, 139 (S.D.N.Y. 2017).

Tatneft has utterly failed to meet its burden, and it does not dispute Ukraine's observation that "[t]he temporal scope of the subpoenas is also impermissibly vague and overbroad."  Br. 9.

*First*, Tatneft has failed to show that discovery into the assets of third parties is relevant to execution of the judgment against Ukraine.  Even after Ukraine challenged its conclusory labelling of third parties as "State Controlled" and part of "Ukraine," Tatneft offered no evidence whatsoever to justify defining "Ukraine" to include 19 allegedly state-controlled entities or an unlimited number of unidentified "other Persons acting or purporting to act for or on Ukraine's behalf, whether or not authorized to do so."[6]  To the contrary, Tatneft has sought clearly irrelevant information.  For example, Tatneft's list of state-controlled entities includes two publicly traded companies and a limited liability company with 100% private ownership, 99.9755% held by a Mr. Pavlo Kudiukin with no apparent ties to the state at all.  *See* Ex. N (PJSC Centrenergo); Ex. O (PJSC Ukrgazbank); Ex. P (BLASCO).  Despite having an opportunity to adduce evidence (if it existed) to support the inclusion of 19 separate entities and unlimited "other Persons" in the definition of "Ukraine," Tatneft has utterly failed to meet its burden.  With no reason to believe that the assets of 19 separate entities and an unspecified number of "other Persons" could be used in execution of a judgment against Ukraine, discovery into their assets does not aid execution.

*Second*, Tatneft has failed to show that information about Ukrainian assets that are presumptively immune from attachment and execution have sufficient relevance to make its requests proportional to its needs.  Unlike Argentina in *NML*, Ukraine does not rely on the FSIA for sovereign immunity from discovery.  Instead, it relies on the basic concept of relevance embedded in Rule 69, under which discovery "must be calculated to assist in collecting on a judgment."  *NML Capital v. Rep. of Arg.*, 695 F.3d 201, 207 (2d Cir. 2012).  The Supreme Court

---

[6] *See* Dkt. 2-1, 2–3; Dkt. 2-2, 2–3.  Tatneft emphasizes that its definition of Ukraine includes 19 entities, the appropriate definition of Argentina in *Aurelius* included 393, and the overbroad definition included 461 entities.  Opp. 11–12.  It does not matter whether the subpoenas list 19, 393, or 461, plus unlimited "other Persons."  There are no hard and fast rules regarding the number of relevant entities, and the burden to demonstrate relevance is on Tatneft.  What matters is whether discovery into their assets is "reasonably calculated to lead to attachable property."  *NML*, 573 U.S. at 138.

recognized that the FSIA included provisions on immunity from jurisdiction and from attachment but determined "[t]here is no third provision forbidding or limiting discovery" as such.  *Rep. of Arg. v. NML Capital*, 573 U.S. 134, 142 (2014).  It did not change that "information that could not possibly lead to executable assets is simply not 'relevant' to execution in the first place."  *Id.* at 144; *see also Wilmington Tr., N.A. v. Est. of Gonzalez*, 2018 WL 10159760 (S.D. Fla. Sept. 19, 2018) (finding *NML* consistent with argument that "Rule 69 discovery in this Court is limited to 'in aid of judgment'").  With no reason to believe that Tatneft could use assets presumptively immune from attachment and execution under the FSIA, discovery concerning such assets is not "calculated to assist in collecting" nor proportional to Tatneft's needs.  *See NML*, 573 U.S. at 138.

Thus, Tatneft is not "entitled to broad and worldwide discovery, including of Ukraine's alter egos," Opp. 9, as it has not even attempted, let alone succeeded, in discharging its burden that the information sought is relevant for judgment execution and proportional to its needs, and that there is any reason to believe that 19 separate entities and unlimited "other Persons" are Ukraine's alter egos.  That Ukraine's interests outweigh Tatneft's is further demonstrated by Tatneft's failure to carry even its "initial burden of proving that the information and documents sought are relevant and proportional to the needs of the case."  *Citizens Union*, 269 F. Supp. 3d at 139.

## III.   CONCLUSION

Judicial economy, consistency, and conservation of resources favor deferring disposition of the motion to quash until disposition of the motion in D.C., from which the judgment originates, to stay execution, including discovery in aid of execution.  Should the motion to stay be denied in D.C., Ukraine respectfully requests an Order quashing or, at the very least, modifying Tatneft's subpoenas and awarding Ukraine reasonable attorneys' fees incurred in relation to this motion.[7]

---

[7] Ukraine expressly reserves foreign sovereign immunity from attachment and execution, as envisaged by the FSIA, Vienna Convention on Diplomatic Relations, Vienna Convention on Consular Relations, and all other applicable law.

Dated: May 20, 2021

Respectfully submitted,

s/ Maria Kostytska
Maria Kostytska (New York Bar # 4380101)
Winston & Strawn LLP
68 rue du Faubourg Saint Honoré
Paris 75008, France
(331) 53648282
(331) 53648220 (fax)
MKostystka@winston.com

Kelly A. Librera
Winston & Strawn LLP
200 Park Avenue
New York, NY 10166-4193
(212) 294-4622
(212) 294-4700 (fax)
KLibrera@winston.com

*Counsel for Ukraine*