# Exhibit A

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

- - - - - - - - - - - - - - X
                              :
PAO TATNEFT,                  :
                              :
        Appellee,             :
                              :
    v.                        :    No. 20-7091
                              :
UKRAINE, c/o MR. PAVLO        :
PETRENKO, MINISTER OF         :
JUSTICE,                      :
                              :
        Appellant.            :
                              :
- - - - - - - - - - - - - - X

                              Friday, October 15, 2021

                              Washington, D.C.


    The above-entitled matter came on for oral
argument pursuant to notice.

    BEFORE:

        CHIEF JUDGE SRINIVASAN, CIRCUIT JUDGE HENDERSON,
        AND SENIOR CIRCUIT JUDGE EDWARDS

    APPEARANCES:

        ON BEHALF OF THE APPELLANT:

        MARIA KOSTYTSKA, ESQ.

        ON BEHALF OF THE APPELLEE:

        MARK E. MCDONALD, ESQ.

**Deposition Services, Inc.**
P.O. Box 1040
Burtonsville, MD 20886
Tel: (301) 881-3344 Fax: (301) 881-3338
info@DepositionServices.com  www.DepositionServices.com

C O N T E N T S

ORAL ARGUMENT OF:                                        PAGE

        MARIA KOSTYTSKA, Esq.
        On Behalf of the Appellant                       3; 21

        MARK E. MCDONALD, Esq.
        On Behalf of the Appellee                          11

WC

```
 1                    P R O C E E D I N G S
 2          THE CLERK:  Case No. 20-7091, Pao Tatneft versus
 3   Ukraine, care of Mr. Pavlo Petrenko, Minister of Justice,
 4   appellant.  Ms. Kostytska for the appellant.  Mr. McDonald
 5   for the appellee.
 6          JUDGE SRINIVASAN:  Good morning, counsel.
 7   Ms. Kostytska, please proceed when you're ready.
 8              ORAL ARGUMENT OF MARIA KOSTYTSKA, ESQ.
 9                  ON BEHALF OF THE APPELLANT
10          MS. KOSTYTSKA:  Good morning, Your Honors.  May it
11   please the Court.  In the interest of time, I will address
12   two grounds for appeal, illegality and forum non conveniens,
13   and answer any questions you may have regarding the two
14   other grounds, arbitrator bias and excess of subject-matter
15   jurisdiction.
16          Illegality.  The award that Tatneft seeks to
17   enforce is based on illegality.  Enforcement should be
18   denied under Article V of the New York Convention, first,
19   due to the limited scope of Ukraine's offer to arbitrate
20   disputes relating to legal investments under Article V(1)(c)
21   and, second, due to the American public policy against
22   illegality under Article V(2)(b).
23          If the Court were to allow enforcement, it would
24   lend its aid and reward illegality.  The vast majority of
25   Tatneft's claims is for the loss of its indirect
```

WC

1   shareholding of Ukrtatnafta, a Ukrainian company.  The

2   indirect shareholding was acquired using promissory notes --

3   essentially, promises to pay.  Ukrainian law prohibited

4   capitalizing a company with promissory notes.

5          The public policy reasons behind the prohibition

6   were similar to those of the D.C. Code, such as promissory

7   notes often prove to be uncollectible; if promissory notes

8   were counted part of the stated capital, shareholders and

9   creditors would be misled or defrauded; and paying for

10  shares with promissory notes dilutes the equity of the other

11  shareholders; it also causes the company to forgo other

12  sources of capital.

13         In this case, Amruz and Seagroup,

14  foreign-incorporated shell companies with concealed

15  beneficial ownership, squeezed their way into Ukrtatnafta to

16  form a voting alliance with Tatneft, and these shell

17  companies paid for their shares with promises to pay 65.8

18  million, and only 3 million were ever collected.

19         After the illegality of --

20         JUDGE SRINIVASAN:  Excuse me one second.  The

21  implications of this argument, would it mean that any time,

22  any time an award is thought to be in violation of foreign

23  law, that it implicates the public policy exception?

24         MS. KOSTYTSKA:  Your Honor, the illegality

25  argument in this case implicates two provisions of the New

WC

1  York Convention.  The first one has to do with the scope of

2  the offer to arbitrate, because the BIT between Russia and

3  Ukraine specifically provides that disputes that can be

4  arbitrated under BIT have to arise out of legal investments.

5  So the legality requirement is encompassed in the BIT, which

6  is part of the agreement to arbitrate and which define the

7  scope of the offer to arbitrate.

8          And as far as the public policy exception is

9  concerned under Article V(2)(b), not any illegality would

10 implicate the public policy exception, but any illegality

11 that is not trivial and that raises the type of concerns

12 that I have just described would certainly come within the

13 purview of the public policy exception, Your Honor.

14          In the district court proceeding, it was

15 uncontested that disputes relating to illegal investments

16 are outside the scope of the Ukraine's offer to arbitrate in

17 the meaning of Article V(1)(c) of the New York Convention,

18 and it was also undisputed that the United States has a

19 public policy against illegality in the meaning of Article

20 V(2)(b) of the New York Convention.

21          Tatneft did not even attempt to defend the

22 legality of the share purchase using promissory notes in

23 these proceedings; yet the district court did not evaluate

24 Ukraine's concern with the illegality of the share purchase

25 using promissory notes and did not draw Article V

1   consequences from it.  The district court's order should be

2   reversed, and enforcement should be denied for illegality

3   under Article V.

4        Turning now to forum non conveniens, this case has

5   no connection to the United States other than it being a

6   contracting party to the New York Convention.  The locus of

7   the dispute is in Ukraine.  The witnesses, experts, and

8   assets are in Ukraine.  The dispute involves complex issues

9   of Ukrainian law and also Russian and Soviet law.

10  Illegality of the share purchase is central to this dispute.

11       Tatneft has not identified any assets of --

12       JUDGE SRINIVASAN:  We have some decisions that

13  seem to stand for the proposition that forum non conveniens

14  is not a basis on which there's relief in the context of a

15  proceeding to enforce an arbitral award.

16       MS. KOSTYTSKA:  Your Honor, let us look at the

17  last footnote of the forum non conveniens section of TMR --

18       JUDGE SRINIVASAN:  Right.

19       MS. KOSTYTSKA:  -- if this is decision to which

20  you refer --

21       JUDGE SRINIVASAN:  Yes, TMR is --

22       MS. KOSTYTSKA:  -- and --

23       JUDGE SRINIVASAN:  -- and others, others that echo

24  it.

25       MS. KOSTYTSKA:  -- and the last footnote of the

1   TMR decision expressly carves out the question as to whether

2   the forum non conveniens arguments are available or

3   unavailable in New York Convention confirmation proceedings

4   from its determination, and I read:  Accordingly, we do not

5   consider TMR's alternative contention that, contrary to the

6   Second Circuit's decision in Monegasque v. Naftogaz of

7   Ukraine, the doctrine has no place in an action to enforce

8   an arbitral award.

9           So this particular question was specifically

10  carved out from this Court's determination, and the

11  (indiscernible) of Monegasque of the Second Circuit was

12  undisturbed, and in that particular case, the Second Circuit

13  specifically held that forum non conveniens is available as

14  an argument in New York Convention proceedings, and why?

15  Because Article V of the New York Convention sets forth the

16  substantive defenses to confirmation.  As Article --

17          JUDGE SRINIVASAN:  On the subject of footnotes, I

18  thought that there was a footnote in our Stileks decision

19  that says -- I think relying on TMR -- that says that forum

20  non conveniens is unavailable in the arbitral context.

21          MS. KOSTYTSKA:  Your Honor, that footnote refers

22  and relies to TMR, and we submit that that footnote is

23  dictum, because by the time the Court got to that footnote,

24  it already affirmed the confirmation of the award on two

25  other grounds.  The first one was the subject-matter

WC

1   jurisdiction under the Foreign Sovereign Immunities Act, and

2   the second one had to do with the pendency of some foreign

3   proceedings.  So after having affirmed the confirmation on

4   those two grounds in the body, it got to this footnote.  So

5   we submit this is dictum, and so the only determination that

6   perhaps requires clarification is --

7               JUDGE SRINIVASAN:  Your audio is -- your audio is

8   breaking up --

9               JUDGE EDWARDS:  Your audio is breaking up, yes.

10               JUDGE SRINIVASAN:  -- and when you, when you turn

11   away, your audio is a little bit off.  Sorry, it's --

12               MS. KOSTYTSKA:  Yes.  Your Honor, and I also would

13   like to draw attention to Article III of the New York

14   Convention, and this is the provision specifically that the

15   Second Circuit interpreted.  So while holding that the

16   defenses in Article V are substantive matters, the forum non

17   conveniens argument is procedural in nature, and Article III

18   of the New York Convention specifically provides that

19   enforcement has to be conducted and done in accordance with

20   the procedures of the forum.  So according to Article III of

21   the New York Convention, the forum non conveniens argument

22   remains available in New York Convention confirmation

23   proceedings.

24               So, Your Honor, this case has no connection to the

25   United States other than the United States being a

WC

1    contracting party to the New York Convention.  So why are we

2    here today?  Because of forum shopping.  We submit that the

3    reason why this Russian company, with close ties to the

4    Republic of Tatarstan, a unit of the Russian Federation,

5    dropped a jurisdictional hook in this district is to seek

6    worldwide discovery into the assets of not only Ukraine but

7    also numerous Ukrainian entities of strategic importance to

8    the nation's welfare.

9         This Russian company is seeking to modelize

10   far-reaching jurisdictional powers of American courts at

11   times of geopolitical hostilities.  This case should be

12   dismissed for forum non conveniens, and I will discuss very,

13   very briefly -- first, the district court erred in

14   misconstruing the Court's precedent TMR to provide for a

15   categorical rule that a foreign forum is always unavailable,

16   inadequate in U.S. proceedings to enforce an arbitral award

17   under the New York Convention; and second, such categorical

18   reading of TMR would contravene Supreme Court precedent,

19   particularly Piper and Sinochem.

20        With regard to the first point, TMR does not have

21   such a categorical rule, it cannot be that a foreign forum

22   is always inadequate and always unavailable in an action to

23   confirm an arbitral award just because any such action can

24   be characterized as an action to attach property in the

25   United States, even where, as here, the judgment creditor

WC

1   has (indiscernible) any property of Ukraine in the District

2   and has openly admitted that it is unaware of any such

3   property, and as we just discussed, such categorical reading

4   of TMR would be contrary to the last footnote of the forum

5   non conveniens section of that decision.

6        Turning now to the second point, such categorical

7   reading of TMR would contravene Piper and Sinochem, the rule

8   under Piper has always been and remains that an alternative

9   forum can only be inadequate if the remedy that it provides

10  is so clearly inadequate and unsatisfactory that it is no

11  remedy at all, and the examples were that the defendant is

12  not amenable to service of process or foreign law does not

13  permit litigation of the subject matter of the dispute, and

14  this is a very low standard of adequacy, easily satisfied

15  here.

16        And second, I would like to turn to Sinochem,

17  which was decided two years after TMR.  It confirmed the

18  continued vitality of the forum non conveniens doctrine

19  because Sinochem was also an attachment case, and even

20  though the attachment remedy was sought in that case, that

21  did not preclude dismissal on forum non conveniens ground.

22  Had attachment --

23        JUDGE SRINIVASAN:  I think we have your Sinochem

24  argument from the briefing, and I just want to make sure

25  that my colleagues don't have additional questions --

WC

1          JUDGE HENDERSON:  No.

2          JUDGE SRINIVASAN:  -- for you before we give

3    Mr. McDonald a chance to respond.

4          JUDGE HENDERSON:  No.

5          JUDGE EDWARDS:  No.

6          JUDGE SRINIVASAN:  Okay.  Thank you,

7    Ms. Kostytska.  We'll give you a little time for rebuttal.

8    Mr. McDonald, we'll hear from you now.

9          ORAL ARGUMENT OF MARK E. MCDONALD, ESQ.

10                  ON BEHALF OF THE APPELLEE

11          MR. MCDONALD:  Thank you, Your Honor.  May it

12   please the Court.  I'm Mark McDonald for the appellee,

13   Tatneft.

14          This case, there's a limited issue in front of the

15   district court which is whether to recognize in the United

16   States the final award which was rendered in France and

17   upheld by the courts in France, and as this Court and others

18   have recognized, the award debtor, Ukraine, in a case like

19   this one, bears a very heavy burden to overcome the emphatic

20   federal policy in favor of international arbitration awards

21   and upholding our treaty obligations under the Convention.

22          The district court was absolutely correct to

23   reject all of Ukraine's objections to enforcement of this

24   award, even though they've been somewhat of a moving target

25   in the four-plus years of this case, and all four of the

WC

1    issues, including the two that counsel discussed just now

2    that are raised on this appeal, are meritless, and the

3    district court's final judgment affirming the award should

4    be affirmed by this Court.

5            So I'll start with the illegality point which was

6    raised.  This is the issue of the way in which Amruz and

7    Seagroup, which were not the claimants in the arbitration,

8    but the way that those companies purchased their shares in

9    the underlying company in the 1990s, and those shares were

10   then purchased subsequently by Tatneft, the claimant in the

11   arbitration.

12           Before the Court can even get to the merits of

13   that issue, Ukraine actually waived this argument -- and not

14   just once, but twice.  The first time was in the arbitration

15   itself, where Ukraine specifically requested that the

16   arbitral tribunal address its own jurisdiction and it raised

17   four separate jurisdictional arguments, including a very

18   similar argument that Tatneft's own purchase of the shares

19   in the company were outside of the Bilateral Investment

20   Treaty, or the BIT, very similar argument to the argument

21   that's being raised now with respect to the Amruz and

22   Seagroup shares, but it never raised the argument that it's

23   making to this Court today as an argument --

24           JUDGE SRINIVASAN:  Insofar as that argument comes

25   through the lens of the public policy issue, I'm not sure

1    that it's waivable, because that's not seeking to vindicate

2    the interest of a particular party; that's seeking to

3    vindicate the interest of the United States.

4            MR. MCDONALD:  I agree with that, Your Honor.  So

5    the structure of Article V of the New York Convention is

6    that Article V(1) are the defenses that have to be raised by

7    the party resisting enforcement and then Article V(2),

8    including the public policy exception, are sort of available

9    to be recognized in court, if you will, and the public

10   policy argument comes under that -- the latter of those two.

11   But --

12           JUDGE SRINIVASAN:  You're only talking about

13   V(1)(c)?  Is that your --

14           MR. MCDONALD:  That's where I was starting, but

15   I'm happy to talk about Article V(2)(b) --

16           JUDGE SRINIVASAN:  No, no.  I didn't realize which

17   -- the same underlying factual --

18           MR. MCDONALD:  It is.

19           JUDGE SRINIVASAN:  -- the gravamen surfaces both

20   under V(1)(c) and under public policy, and I just didn't

21   know --

22           MR. MCDONALD:  Yes.

23           JUDGE SRINIVASAN:  -- which branch you were

24   talking about.

25           MR. MCDONALD:  Yes.  Yes.  That's a fair point,

1  Your Honor.  So just -- okay, finish on V(1)(c), the waiver

2  was clear in the tribunal -- in the arbitration itself.  It,

3  again, waived the argument in the district court because in

4  July of 2017, when Tatneft had filed the petition in the

5  district court, the district court ordered Ukraine to

6  respond to that petition with its New York Convention

7  defenses and it did so, raising the arbitrator bias point --

8  which is raised again on this appeal but wasn't discussed

9  just now -- and a separate argument as to this allegation

10 that Tatneft had acquired the Amruz and Seagroup shares from

11 Amruz and Seagroup, who manufactured jurisdiction in the

12 arbitration.  That issue is separate from the illegality of

13 Amruz and Seagroup's own purchase of the shares, but anyway,

14 that issue has been abandoned on this appeal.  It's not been

15 raised.

16        Even if the issue had not been waived, under

17 Article V(1)(c) it would be -- it would not succeed under

18 this Court's precedents, including Chevron and more recently

19 the Stileks decision that's been discussed today.  Here,

20 just as in both of those cases, the Bilateral Investment

21 Treaty incorporated by reference the 1976 UNCITRAL

22 Arbitration Rules, which this Court has found constitutes

23 clear and unmistakable evidence that the parties delegated

24 arbitrability questions to the arbitrators.  Now, Ukraine

25 made an argument in their brief that, well, that doesn't

1  matter because the arbitrators here didn't make a finding on

2  the illegality points and so there's nothing to defer to,

3  but with respect, that's because Ukraine, again, did not

4  make this argument in the arbitration and never raised this

5  issue as a jurisdictional defense in the arbitration.

6          And I would point the Court to language in the

7  Stileks decision from earlier this year that when the

8  parties delegate arbitrability issues to the arbitrators,

9  it's not merely a cushion of deference, it's just that the

10 court has actually no power to decide the arbitrability

11 issues.  That was a question, if it was going to be a

12 question, for the arbitrators alone.

13         So turning, Your Honor, to V(2)(b) of the public

14 policy aspect of this argument, the -- as this Court has

15 said time and again, public policy is a very narrow

16 exception to a New York Convention case seeking recognition

17 of an arbitral award, and it simply does not encompass,

18 however Ukraine wants to phrase it, you know, illegality

19 under Ukrainian corporate law, the -- you know, obviously

20 there's no public policy of the United States with respect

21 to that, but okay, let's say, does the United States have a

22 public policy with respect to the purchase of shares with

23 promissory notes?  Well, you know, maybe there was some sort

24 of policy in the District of Columbia in the 1980s when the

25 D.C. Code prohibited that type of purchase.  Whatever that

WC

1  policy reason was has since been abandoned because the Code

2  has since been revised and now you can purchase shares in a

3  company with promissory notes, but regardless, that's not

4  the type of public policy that's so well-defined and

5  dominant that it can overcome the recognition of a foreign

6  arbitration award that's subject to the New York Convention.

7  The only types of cases where that exception has been

8  successfully invoked involved fraud or other very unique

9  circumstances, and nothing like that has been alleged here.

10       And I would also note that the public policy

11  exception is not an occasion for the district court or this

12  Court to substitute its fact-finding for the arbitration --

13  for the arbitration tribunal's fact-finding.  That was the

14  holding of the Supreme Court of the United States in the

15  United Paperworkers case.

16       So unless any of Your Honors has any questions on

17  the illegality point, I'll turn to forum non conveniens,

18  although I don't --

19       JUDGE EDWARDS:  What do you -- what's your

20  response on the V(1)(d), tribunal composition?

21       MR. MCDONALD:  Sure, Your Honor.  So --

22       JUDGE EDWARDS:  What standard do you think the

23  district court applied?

24       MR. MCDONALD:  Well --

25       JUDGE EDWARDS:  Did the district court apply

WC

1   evident partiality, justifiable doubts, or something else?

2             MR. MCDONALD:  I think, if you look at the

3   district court's opinion, that it --

4             JUDGE EDWARDS:  I did.  I did.

5             MR. MCDONALD:  -- actually reviews all three

6   standards that have been suggested in this case and found

7   that --

8             JUDGE EDWARDS:  Do you think the district court

9   said under justifiable doubts, I'm reaching the same

10  conclusion?

11            MR. MCDONALD:  I think the --

12            JUDGE EDWARDS:  I mean, if you can point me to

13  language, that's what I was trying to figure out, because it

14  really is very unclear what standard the district court is

15  applying.  Now, if it's true that the district court said

16  I'm reaching the same result with respect to all three, then

17  of course I'd look at it that way, but I couldn't get myself

18  there.

19            MR. MCDONALD:  I think, I think you're right, Your

20  Honor, that the -- that justifiable doubts standard comes

21  from the UNCITRAL Rule --

22            JUDGE EDWARDS:  Right.

23            MR. MCDONALD:  -- and I don't -- I think the

24  district court, her decision was that that cannot be the

25  standard.

1         JUDGE EDWARDS:  Do you agree with that?

2         MR. MCDONALD:  I agree with it in the following

3   sense.  So in this -- this Court, in the Belize Bank case,

4   found -- well, it said, right, that in an arbitrator bias

5   case, as opposed to a question -- a case presenting a

6   question as to how the arbitrators were selected, like, you

7   know, maybe there would be an issue under V(1)(d) if --

8         JUDGE EDWARDS:  But Belize dealt with the public

9   policy defense.

10         MR. MCDONALD:  I agree, but what the Court said

11  was, in a case like this, where the allegation is that the

12  arbitrators were bias, the only potential grounds under

13  Article V was not V(1)(d) but V(2)(b), the public policy

14  exception, and the reason that is, because this is not a

15  question about how the tribunal was composed.  There were

16  rules, you know --

17         JUDGE EDWARDS:  So wait.  So then the district

18  court -- you -- I think you're trying to dance away from it.

19  I'd really like an answer -- the district court spent a

20  number of paragraphs, as I remember, on this question and

21  was talking about these different standards.  I thought the

22  correct answer would be that justifiable doubts is the

23  correct standard, and I'm wondering if you think the

24  district court applied that standard, and you -- your first

25  dodge was to say, well, she applied everything.  I'm not

1   sure that's right, and if she didn't apply justifiable

2   doubts, can we reach that decision on our own or do we have

3   to remand for determination on that?

4           MR. MCDONALD:  I think, Your Honor, there's,

5   there's no dispute of what the facts are, that this Court

6   can decide it on its own if it thinks that that's the right

7   standard.  If I can just explain for a minute why I don't

8   think that's the right standard.  The combination of this

9   Court's decision in Belize Bank and this Court's decision in

10  the Republic of Argentina v. AWG, I think, explain this.

11          So in AWG, that case was a domestic arbitration

12  case under Chapter 1 of the FAA.  So the evident partiality

13  standard applied.  Now, interestingly, that case also

14  involved an arbitration governed by the UNCITRAL Rules, but

15  in that case this Court said, even in a Chapter 1 case, it's

16  not the justifiable doubts standard under the UNCITRAL Rules

17  that applies, it's the evident partiality standard under the

18  FAA, because you don't just get to come into court, after

19  you lose an arbitration, and say any sort of foot fault

20  under the underlying arbitration rules gives me an excuse to

21  undo --

22          JUDGE EDWARDS:  I don't see how evident partiality

23  can apply in a case with respect to an international issue.

24          MR. MCDONALD:  I agree, and it certainly does not,

25  and that was the point in the Belize Bank case, which is to

1   say that in a --

2              JUDGE HENDERSON:  Right.

3              MR. MCDONALD:  -- Chapter 2 case like this one,

4   the evident partiality standard does not apply, and in

5   fact --

6              JUDGE EDWARDS:  Right.

7              MR. MCDONALD:  -- the standard is even tougher

8   because, because this is not a primary jurisdiction case

9   where the Court has more latitude to undo an arbitration

10  award.  It, in fact, has less.  And so if the -- if

11  Ukraine's argument were accepted here, it would be

12  backwards, right?  You would be in an Article -- in a,

13  sorry, in a Chapter 2 international arbitration award case.

14  You would actually have more latitude to undo an arbitration

15  for an allegation like this than you would in the Chapter 1

16  case, and that just can't be right.

17             JUDGE EDWARDS:  Okay.

18             JUDGE SRINIVASAN:  All right.  Let me make sure my

19  colleagues don't have additional questions for you,

20  Mr. McDonald.

21             JUDGE HENDERSON:  No.

22             JUDGE SRINIVASAN:  Thank you --

23             MR. MCDONALD:  Thank you.

24             JUDGE SRINIVASAN:  -- Mr. McDonald.

25  Ms. Kostytska, we'll give you two minutes for your rebuttal,

WC

 1  please.

 2              ORAL REBUTTAL OF MARIA KOSTYTSKA, ESQ.

 3                  ON BEHALF OF THE APPELLANT

 4              MS. KOSTYTSKA:  Thank you, Your Honor.  With

 5  regard to the waiver point, Ukraine does not waive its

 6  illegality argument by not raising it in the arbitration

 7  because it did in fact argue the illegality point during

 8  both the admissibility and jurisdictional phases of the

 9  arbitration.  So even though the illegality argument was

10  raised, it was not squarely addressed in the award on

11  jurisdiction and admissibility.

12          And then most certainly, Ukraine raised illegality

13  of the share purchase as a merits defense, and the tribunal

14  did not address this issue and merely stated that a contrary

15  view, that a share purchase with promissory notes be legal

16  was tenable.  So stating that something is tenable is not a

17  determination.  So this question was never resolved by the

18  tribunal, even though this question was put before it.

19          And we also don't accept that we waived the

20  illegality argument before the district court, because in

21  the argument section of the opposition -- not just in the

22  factual background section, in the argument section -- we

23  stated, in Ukraine's submission, enforcement of the merits

24  award would lend the court's power to wrongdoers Amruz and

25  Seagroup, which unlawfully acquired their shares in

1  Ukrtatnafta by using promissory notes in violation of

2  Ukrainian rule.

3         So this point was argued before the district

4  court, and the district court could have and should have

5  drawn Article V consequences from this argument, most

6  certainly under the public policy exception, but if more

7  clarity was necessary to brief this argument under the scope

8  exception, then we requested supplemental briefing when

9  additional Ukrainian law evidence became available in the UK

10  proceeding.  So had a fuller argumentation been helpful, we

11  offered to provide it, and -- well, on this particular

12  (indiscernible).

13         JUDGE SRINIVASAN:  Okay.

14         MS. KOSTYTSKA:  And opposing counsel raised the

15  point with regard to -- Your Honor, I see that my time has

16  expired.  May I finish this one point?

17         JUDGE SRINIVASAN:  Yes, you can finish this one

18  point quickly.  Thank you.

19         MS. KOSTYTSKA:  Yes.  So the last point is that we

20  are not foreclosed by Chevron to raise this point, because

21  Chevron does not allow to reargue admissibility --

22  arbitrability determinations that were actually decided by

23  the tribunal and there is no authority that precludes you

24  from looking at the points that have not actually been

25  decided by the tribunal and --

WC

23

1          JUDGE SRINIVASAN:  Okay.

2          MS. KOSTYTSKA:  -- there was no factual finding by

3    the tribunal on this particular point and there is nothing

4    to defer to, Your Honor.

5          JUDGE SRINIVASAN:  Okay.  Thank you, counsel.

6    Thank you to both counsel.  We'll take this case under

7    submission.

8          (Whereupon, the proceedings were concluded.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

WC

## DIGITALLY SIGNED CERTIFICATE

       I certify that the foregoing is a correct transcription of the electronic sound recording of the proceedings in the above-entitled matter.


*Wendy Campos*

_____            October 19, 2021

WENDY CAMPOS

DEPOSITION SERVICES, INC.